[No. S048396. Nov. 20, 1997.]

BRANDEN BICKEL et al., Plaintiffs and Appellants, v.
CITY OF PIEDMONT et al., Defendants and Respondents.

**COUNSEL**

Claudia Cate, in pro. per., Aune & Associates and Robert E. Aune for Plaintiffs and Appellants.

Hardin, Cook, Loper, Engel & Bergez, Robert D. Eassa and Timothy J. McCaffery for Defendants and Respondents.

Alan K. Marks, County Counsel, and Paul F. Mordy, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

KENNARD, J.—In 1977, the Legislature enacted the Permit Streamlining Act. (Gov. Code, § 65920 et seq.; all statutory references are to the Government Code unless otherwise indicated.) The act, as relevant here, has certain time limits within which a government agency must either approve or disapprove an application for a development project. (§ 65950 et seq.) Failure to act within these time limits "shall be deemed approval of the permit application for the development project." (§ 65956, subd. (b).)

Does the act prohibit an applicant's waiver of the time limits? We conclude that it does not and that in this case substantial evidence supports the trial court's finding of waiver by plaintiff applicants.

## I.

On March 7, 1991, plaintiffs Branden Bickel and Claudia Cate applied to the City of Piedmont Planning Commission (Planning Commission) for approval of a proposed 2,739-square-foot second story addition to their ranch-style home. The commission assigned No. 44-91 to the application, and scheduled a public hearing for April 8, 1991. After plaintiffs learned that some of their neighbors had expressed concerns about the proposed addition, plaintiffs asked the commission to take the matter off its April 8 calendar. On April 8, the Planning Commission granted the request, and continued the hearing for six months. Plaintiffs did not resubmit their remodeling application within that six-month period, nor did they ask that the matter be rescheduled for a public hearing.

On March 10, 1992, plaintiffs submitted revised drawings to the Planning Commission, followed on March 12 by another request for approval of the proposed second story addition to their home. The commission assigned No. 52-92 to this application, scheduled a public hearing for April 13, and gave notice to plaintiffs' neighbors.

At the April 13, 1992, hearing, several neighbors objected to plaintiffs' proposed second story addition on the grounds it would tower over adjacent properties, intrude upon their views and privacy, and be incompatible with the neighborhood's single-story homes. The neighbors suggested expansion of the first floor level as a less intrusive option. Thereafter, the Planning Commission concluded that although a full second story addition "appeared impossible for this property, a partial second story addition may be acceptable." Plaintiff Branden Bickel, a real estate attorney, then asked for a continuance to consider the commission's comments. The commission continued the hearing for a period not to exceed six months. The commission thereafter notified plaintiffs that the revised plans should be submitted within the six-month period, and that it would consider plaintiffs' application for a remodeling permit at the commission's next regular meeting.

In September 1992, plaintiffs submitted a revised set of drawings to the Planning Commission, which set a public hearing for October 12. Prior to the hearing, the chairman of the Planning Commission visited plaintiffs' property and suggested certain changes in plaintiffs' remodeling plans. Plaintiffs then sought to have the October 12 hearing rescheduled to a later date. The commission notified plaintiffs by letter of a continuance not to exceed three months. Plaintiffs submitted revised plans, and the matter was scheduled for a public hearing on November 9.

At that hearing, some of plaintiffs' neighbors supported plaintiffs' revised remodeling plans while others opposed them. The minutes of the hearing

reflect that the chairman of the Planning Commission "supported the concept of a second story" but "opposed the submitted design." The other members opposed the plans "for design and massing reasons." The minutes further state that the commissioners "reiterated their October suggestion to [plaintiffs] that a partial second story be considered" and that "the Planning Commission continues for a period not to exceed three months further consideration of Mr. Branden Bickel's design review application for proposed construction . . . ." Plaintiffs received written notice of the continuance. Although the minutes do not record who initiated the request for a continuance, the parties agree that the following colloquy occurred at the hearing:

"[Commission Chair]: It's not going to pass tonight . . . [s]o it looks like we're on a continuance.

"[Commission member]: Yeah . . . if that's what the applicant would like.

"[Applicant Bickel]: That's what the applicant would like.

"[Commission Chair]: Alright.

"[Commission member]: Move for a three month continuance.

"[Commission Chair]: Is there a second?

"[Commission member]: Uh, I'll second the motion.

"[Commission Chair]: Fine. There'll be a continuance for three months."

On January 12, 1993, plaintiffs submitted yet another revised set of plans. Following a public hearing on February 8, 1993, the Planning Commission denied approval because the design of plaintiffs' proposed second story addition was "too massive, too bulky and not in keeping with other homes in the neighborhood."

Plaintiffs appealed to the Piedmont City Council (City Council), asserting for the first time that their remodeling application was "deemed" approved by operation of law because the Planning Commission had neither approved nor disapproved the application within the statutory time limits. When the City Council affirmed the commission's ruling, plaintiffs petitioned the Alameda County Superior Court for a writ of mandate. That court denied the petition on the grounds of waiver and estoppel. Plaintiffs sought review in

the Court of Appeal, which reversed, concluding that "waiver has no place in the policy and provisions of the [Permit Streamlining] Act." One justice on the three-member panel wrote a concurring and dissenting opinion, concluding that the act did not preclude a waiver of its time limits but that in this case the facts did not establish a waiver. We granted review.

## II.

In 1977, the Legislature enacted the Permit Streamlining Act (hereafter sometimes referred to as the Act) to relieve applicants from protracted and unjustified governmental delays in processing their permit applications. (See generally, Merritt, *The Permit Streamlining Act: The Dream and the Reality* (Cont.Ed.Bar 1991) 1 Land Use Forum 30; Wilson, *Down Stream from Streamlining* (Aug. 1987) 7 Cal.Law. 67.) It was supported by such diverse groups as the California Chamber of Commerce, the California Manufacturers Association, and the Sierra Club, and it received only one negative vote in the Legislature when enacted. (Merritt, *The Permit Streamlining Act: The Dream and the Reality, supra,* at p. 30.) The one event seen as a catalyst for the Act was the decision by Dow Chemical Company to withdraw its applications for a proposed $500 million petrochemical plant in Contra Costa County that would have created 2,000 new jobs. (Wilson, *Down Stream from Streamlining, supra,* at p. 67; see *Ciani* v. *San Diego Trust & Savings Bank* (1991) 233 Cal.App.3d 1604, 1609, fn. 1 [285 Cal.Rptr. 699].) Dow reportedly spent nearly three years and between $4.5 million and $10 million to obtain just four of the sixty-five required permits. (Wilson, *Down Stream from Streamlining, supra,* at p. 67; Merritt, *The Permit Streamlining Act: The Dream and the Reality, supra,* at p. 30.)

The Act expressly declares: "The Legislature finds and declares that there is a statewide need to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects." (§ 65921; *Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 290 [223 Cal.Rptr. 542].) The Act's goal of clarifying the permit process for applicants is effected by requiring state and local agencies to furnish each applicant with "one or more lists" specifying the information the applicant must present to the agency when seeking approval of a project. (§ 65940.) The agency has 30 calendar days after receipt of the application to "determine in writing whether the application is complete" and must immediately notify the applicant of that decision. The agency's failure to act within this 30-day period renders the application complete, precluding the agency thereafter from requesting new or additional information not specified in the lists. (§§ 65943, 65944.)

To expedite decisions on development projects, the Act sets forth a time limit within which a government agency must either approve or disapprove

an application for a land-use permit. If the agency fails to expressly approve or disapprove the application within this time limit, it is "deemed" approved. (§ 65956, subd. (b).) At the time of the events in this case, the time limit started running when the application was complete, and agency approval or disapproval had to occur within six months from the date of completion of the application, subject to an additional ninety days if the city and the applicant mutually so agreed. (Former § 65950; § 65957.)[1] These time limits are "maximum time limits for approving or disapproving development projects." (§ 65953.) An agency must notify an applicant of the Act's time limits. (§ 65941.5.) The agency's failure to approve or disapprove a development project within the statutory time limits is "deemed approval of the permit application for the development project." (§ 65956, subd. (b).)[2]

■ If one were to look only to the above described statutory language, without asking whether the Act precludes an applicant from waiving the requisite time limits, then the Planning Commission's failure to act within the statutory limits would be "deemed approval" of plaintiffs' permit application No. 52-92.[3] As noted earlier, under former section 65950, which governs this case, "the development project shall be approved or disapproved within six months from the date on which an application requesting approval of the project has been received and accepted as being complete by that agency, unless the project proponent requests an extension of the time limit." An agency's failure to either approve or disapprove an application within the statutory time limit is "deemed approval" of the application. (§ 65956, subd. (b).) Application No. 52-92 was accepted by the Planning Commission as complete on April 11, 1992. The statutory six-month period

---

[1]Section 65950 has been amended six times since its original enactment. Originally, the statute granted public agencies one year from the date on which the land-use permit application was accepted as complete within which to approve or disapprove the application. (Stats. 1977, ch. 1200, § 1, pp. 3995-3996.)

Section 65950 now gives a public agency 180 days from the certification of an environmental impact report, 60 days from the adoption of a negative declaration, and 60 days from a determination that the development project is exempt from the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) within which to approve or disapprove a permit application. Subdivision (b) allows an applicant and a public agency to mutually agree to an extension of these time limits.

In 1992, the period relevant here, section 65950 gave public agencies one year from the date the application was accepted as complete to approve or disapprove an application if an environmental impact was prepared, and six months if a negative declaration was adopted or the project was exempt from the California Environmental Quality Act "unless the project proponent requests an extension of the time limit." (Stats. 1989, ch. 847, § 1, p. 2786.)

[2]Under section 65956, an applicant can compel an agency to give public notice of a development project or to hold a public hearing, or both, and the statute provides a means for the applicant to give public notice. (§ 65956, subds. (a), (b).) Because in this case the city gave public notice and held public hearings, these statutory provisions are not in issue here.

[3]Although the complaint alleges facts relating to application No. 44-91 and application No. 52-92, plaintiffs sought relief only with respect to application No. 52-92.

within which the commission had to either approve or disapprove the application expired on October 12, 1992. If plaintiffs' request for, and the commission's agreement to, a continuance of the public hearing scheduled for October 12, 1992, is viewed as the 90-day extension "upon consent of the public agency and applicant" under section 65957 of the Act, then the statutory period elapsed in January 1993, well before the commission's denial of plaintiffs' application at its February 8, 1993, hearing. Therefore, under the statutory language described above, the commission's failure to expressly approve or disapprove plaintiffs' application within the statutorily required six months after the application was accepted as complete would have rendered plaintiffs' permit application automatically approved by operation of law. (§ 65956, subd. (b).)

Automatic approval may not occur, however, if it is possible for an applicant to waive the Act's time limits. The crucial inquiry, therefore, is whether application of the common law doctrine of waiver is prohibited by either the Act's purpose or its statutory language. The trial court ruled that the Act's time limits are subject to the common law doctrine of waiver. We agree, for the reasons given below.

### III.

The term "waiver" means the intentional relinquishment or abandonment of a known right. (See, e.g., *United States* v. *Olano* (1993) 507 U.S. 725, 732 [113 S.Ct. 1770, 1776-1777, 123 L.Ed.2d 508]; *Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 314-315 [24 Cal.Rptr.2d 597, 862 P.2d 158].) A person may waive the advantage of a law intended for his or her benefit (see, e.g., *People* v. *Trejo* (1990) 217 Cal.App.3d 1026, 1032 [266 Cal.Rptr. 266] [a defendant may waive the constitutional right to a jury of 12 persons because the right is primarily for the benefit of the accused]), but "a law established for a public reason cannot be waived or circumvented by a private act or agreement" (*Covino* v. *Governing Board* (1977) 76 Cal.App.3d 314, 322 [142 Cal.Rptr. 812]; see Civ. Code, § 3513). "The doctrine of waiver is generally applicable to all the rights and privileges to which a person is legally entitled, including those conferred by statute unless otherwise prohibited by specific statutory provisions." (*Outboard Marine Corp.* v. *Superior Court* (1975) 52 Cal.App.3d 30, 41 [124 Cal.Rptr. 852].)[4]
Accordingly, to determine whether in this case the Act bars application of the waiver doctrine, we must ascertain (1) whether the Act's time

---

[4]Civil Code section 3513 provides: "Anyone may waive the advantage of a law intended *solely* for his benefit. But a law established for a public reason cannot be contravened by a private agreement." (Italics added.) Contrary to the view of the Court of Appeal majority, the use of the word "solely" in this statute does not compel the conclusion that waiver is precluded if there is any incidental benefit to the public from a statutory right. Section 3513, one of the maxims of jurisprudence in our Civil Code, is an aid to the application of statutory

limits are for the benefit of applicants or are instead for a public purpose, and (2) whether there is any language in the Act prohibiting a waiver.

To ensure that applicants know of the specific requirements for a development project permit, the Act requires an agency to furnish an applicant with "one or more lists" specifying the information the applicant must provide to the agency. (§§ 65940, 65941, 65944.) In this way, the Act protects applicants from potential government abuse resulting from disapprovals based on requirements unknown to the applicant. And in imposing a time limit within which the public agency must approve or disapprove a permit application, the Act protects applicants from the caprice and arbitrariness associated with protracted and unjustified delays by the government. (See *Palmer* v. *City of Ojai, supra,* 178 Cal.App.3d at pp. 290-291.) Thus, the Act benefits primarily applicants seeking agency approval of proposed development projects.

To some extent, the Act benefits the public as well. As the Court of Appeal's majority noted, the Act's time limits benefit neighboring landowners by expediting government decisions on permit applications that may affect their property, benefit other applicants by requiring the agency to make decisions on applications so that their applications may be timely considered, and benefit taxpayers by decreasing the cost of government through increased government efficiency and the prevention of waste.

Some public benefit is, however, inherent in most legislation. The pertinent inquiry, therefore, is not whether the law has any public benefit, but whether that benefit is merely incidental to the legislation's primary purpose. In this case, the Court of Appeal's concurring and dissenting justice viewed the Act's public benefit as incidental: "The primary beneficiary of the time limits is the applicant, the Act being designed to prevent the agency from foot-dragging and coercing time waivers at the applicant's expense. The general public may *incidentally* benefit from expedited land use decisions, aided progress of important large-scale developments, reduced delay for other applicants and perhaps an enhanced business environment generally." (Italics added.) We agree.

A recent decision of this court on the issue of waiver provides some guidance. In *Cowan* v. *Superior Court* (1996) 14 Cal.4th 367 [58 Cal.Rptr.2d

law, not an inflexible legal principle. (Civ. Code, § 3509; *Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13, 21 [51 Cal.Rptr. 881, 415 P.2d 769].) Because it is difficult to conceive of a statutory right enacted *solely* for the benefit of private individuals that does not also have an incidental public benefit, a literal reading of Civil Code section 3513 would eliminate the established rule that rights conferred by statute may be waived unless specific statutory provisions prohibit waiver. For this reason, a literal construction of section 3513 would be unreasonable. (See Civ. Code, § 3542 [interpretations must be reasonable].)

458, 926 P.2d 438], this court held that a criminal defendant may waive the benefit of a statute of limitations to a lesser offense than that charged. We observed that in criminal prosecutions a statute of limitations "exists partly for the defendant's benefit" and partly to achieve certain public benefits, such as encouraging swift and effective law enforcement, thereby enhancing the deterrent effect of criminal sanctions. (*Id.* at pp. 374-375.) Notwithstanding the existence of such public benefits, we concluded that a criminal defendant may indeed waive a statute of limitations if the waiver is knowing, intelligent, and voluntary; if the waiver is made for the defendant's benefit after consultation with counsel; and if the waiver does not disadvantage the defense " ' "or contravene any other public policy reasons motivating the enactment of the statutes." ' " (*Id.* at p. 372.)

Similarly, here we see no good reason why the waiver doctrine should not apply if the administrative record shows that the applicant has made a knowing, intelligent, and voluntary waiver in circumstances where the applicant might reasonably anticipate some benefit or advantage from the waiver, and if the waiver does not seriously compromise any public purpose that the Act's time limits were intended to serve.

To determine whether the Act prohibits land-use permit applicants from waiving the time limits within which an agency must act, we have to examine the language of the Act. The Act contains two sections that expressly mention the term "waiver" or "waiving." Section 65940.5, subdivision (a) prohibits an agency from including in any of its lists specifying the information that an applicant must provide to the agency "a waiver of the time periods . . ."; subdivision (b) of this same section says that no "application shall be deemed incomplete for lack of a waiver of the time periods . . . ." And section 65951 provides that when "a combined environmental impact report-environmental impact statement is being prepared on a development project . . . a lead agency may waive the time limits . . . ." Neither section 65951 nor section 65940.5, however, prohibits a permit applicant from waiving the statutory time limits within which an agency must act.

Indeed, several provisions of the Act expressly allow extensions of the Act's time limits by mutual agreement of the public agency and the applicant. Thus, at the time relevant here, section 65950 specified six months as the period in which the agency had to either approve or disapprove a land-use permit application, "unless the project proponent requests an extension of the time limit." (Stats. 1989, ch. 847, § 1, p. 2786.) Similarly, the current version of section 65950 provides that "[n]othing in this section precludes a project applicant and a public agency from mutually agreeing to an extension of any time limit provided by this section." (§ 65950, subd.

(b).) And section 65957 permits an extension of the time limits "once for a period not to exceed 90 days upon consent of the public agency and the applicant."

The extension provision just mentioned deals with mutual consent, requiring consent of both the applicant and the public agency. The doctrine of waiver, by contrast, focuses on the conduct of only one party; consent of the other party is irrelevant. ■ As has been said: "Waiver refers to the act, or the consequences of the act, of one side. Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party." (*DRG/Beverly Hills, Ltd.* v. *Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59 [35 Cal.Rptr.2d 515]; accord, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 178, pp. 860-861.)

■ In concluding that the Act prohibits an applicant's waiver of the time limits within which a public agency must act, the Court of Appeal's majority in this case looked to the language of section 65957, which allows, by mutual consent, extension of the time limits "*once* for a period not to exceed 90 days." (Italics added.) The majority viewed the Legislature's inclusion of the word "once" as significant. It noted that the general legislative counsel of the League of California Cities had written a letter to the Governor expressing concern with the one-time limitation on extensions, preferring instead that extensions be permitted any time by mutual agreement of the public agency and the applicant. (Letter of Sept. 15, 1978, from general legislative counsel, League of Cal. Cities to Governor Edmund G. Brown, Jr., contained in Governor's chaptered bill file, ch. 1113 (1977-1978 Reg. Sess.).) From the Legislature's refusal to permit such multiple extensions, the Court of Appeal's majority in this case, quoting *Palmer* v. *City of Ojai, supra,* 178 Cal.App.3d at page 293, inferred an intent to place "'firm time limitations on the deliberations of public agencies concerning land use decisions.'" (Italics omitted.) But, as the concurring and dissenting justice pointed out, the addition of the word "once" to the statute "only clarified what otherwise might have been read as allowing *unlimited* 90-day extensions by mutual consent [and] did not address the doctrine of waiver . . . ."

The Court of Appeal majority also expressed concern that to apply the waiver doctrine here would "open the door to subtly coerced 'waivers.'" It reasoned: "It takes no particular imagination to envision a commission not ready or willing to approve an application, but 'up against' the Act's deadline, politely suggesting that perhaps more time might be the solution but that, because of the Act, such would have to come via a formal request

from the applicant complete with a 'waiver' of the Act. Most applicants would, we venture, be under severe pressure to acquiesce in such a 'suggestion.'" A waiver, however, is not effective unless it is voluntary. (See, e.g., *Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Outboard Marine Corp.* v. *Superior Court, supra*, 52 Cal.App.3d at p. 41.) Therefore, if an agency improperly coerces an applicant into relinquishing the right to have the agency act within the statutory time limits, the applicant cannot be said to have voluntarily given up that right. In that event, there is no valid waiver. As we mentioned earlier, the Act prohibits agencies from demanding "waivers," that is, extensions of the Act's time limits as a condition of accepting or processing applications (§ 65940.5), and from disapproving an application in order to comply with the Act's time limits (§ 65952.2). Nothing in the language of the Act, however, prohibits an applicant from voluntarily relinquishing, for the applicant's own benefit based on the applicant's view of his or her own interest, the right to an agency decision within the statutory time limits.

If waiver of the Act's time limits were not permissible, an applicant whose permit application contained substantial but curable defects would be unable to obtain a postponement of the decision beyond the Act's time limits to amend the application, because such a postponement would, under subdivision (b) of section 65956, result in the automatic approval of the defective application. In order to cure the defects in the application, the applicant would have to accept a denial of the original application, submit a new application, pay new application fees, and start the entire approval process again, a time-consuming and expensive procedure. Moreover, a "no waiver" rule would unfairly reward those applicants who, anticipating a denial of their land-use permit application, request or agree to a continuance for the purpose of revising and resubmitting their plans, wait until the Act's time limits have expired, and then assert that the application has been deemed approved by operation of law because the Planning Commission failed to act within the requisite time limit. These consequences are inconsistent with the Legislature's intent to "streamline" the processing of land-use permit applications.

IV.

 Having concluded that the Act does not prohibit an applicant from waiving the time limits within which the public agency must act, we must now determine whether plaintiffs' conduct did constitute such a waiver, as the trial court found.

 Whether there has been a waiver is a question of fact. (See, e.g., *Keating* v. *Superior Court* (1982) 31 Cal.3d 584, 605 [183 Cal.Rptr. 360, 645

P.2d 1192]; *Sawday* v. *Vista Irrigation Dist.* (1966) 64 Cal.2d 833, 836 [52 Cal.Rptr. 1, 415 P.2d 816].) We review the trial court's finding of waiver under the deferential "substantial evidence" standard. (See, e.g., *Engalla* v. *Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 983; *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 185 [151 Cal.Rptr. 837, 588 P.2d 1261]; *Schiro* v. *Curci* (1990) 220 Cal.App.3d 840, 845 [269 Cal.Rptr. 639].) "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms* v. *Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813], ellipses in *Baldwin.*) ▮ Here, there is substantial evidence to support the trial court's finding of waiver.

▮ To constitute a waiver, there must be an existing right, knowledge of the right, and an actual intention to relinquish the right. (*City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107 [48 Cal.Rptr. 865, 410 P.2d 369].) "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

▮ At the November 9, 1992, public hearing before the Planning Commission, when, following opposition and concerns voiced by plaintiffs' neighbors as well as by commission members, it became clear that plaintiffs' proposed second story addition would not be approved, this colloquy occurred:

"[Commission Chair]: It's not going to pass tonight . . . [s]o it looks like we're on a continuance.

"[Commission member]: Yeah . . . if that's what the applicant would like.

"[Applicant Bickel]: *That's what the applicant would like.* [(Italics added.)]

"[Commission Chair]: Alright.

"[Commission member]: Move for a three month continuance.

"[Commission Chair]: Is there a second?

"[Commission member]: Uh, I'll second the motion.

"[Commission Chair]: Fine. There'll be a continuance for three months."

As the concurring and dissenting justice of the Court of Appeal panel in this case observed, the commission's statements indicated that "the commission was saying it was prepared to deny the application outright but was offering to accommodate [plaintiffs] once more if that was their preference." Thus, when in response to the commission's inquiry whether plaintiffs would want another extension within which to submit revised plans, plaintiff Bickel said he did indeed want a continuance of the hearing, he voluntarily relinquished his right under the Act to have the commission render a decision on the merits at the November 9 hearing. But Bickel's statement was not a relinquishment of the right to have the commission approve or disapprove the application within the statutory time limit. The determination that the continuance should be for three months, after the time limits of the Act had expired, was made by the chairman of the Planning Commission, without any comment by plaintiffs. Thus, the facts of the November 9, 1992, hearing, standing alone, do not establish that plaintiffs waived the Act's time limitations. Also pertinent, however, are the events that occurred after the November 9 hearing. Plaintiffs, who concede that they are charged with knowledge of the Act's time limits, did not submit their revised plans to the Planning Commission for approval until *after* expiration of the time in which the commission had to indicate either approval or disapproval. When considered together, plaintiffs' conduct at and after the November 9, 1992, hearing provides substantial evidence to support the trial court's finding that plaintiffs waived their right under the Act to have the Planning Commission approve or disapprove their permit application within the statutory period.[5]

DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded with directions to enter judgment affirming the judgment of the trial court.

George, C. J., Mosk, J., and Werdegar, J., concurred.

---

[5]This conclusion makes it unnecessary to address the issue of whether the doctrine of equitable estoppel applies to the Act and, if so, whether it bars plaintiffs from invoking the time limits of the Act here.

BAXTER, J.—I respectfully dissent. In language too plain for debate, the Permit Streamlining Act (Gov. Code, § 65920 et seq.; Act)[1] specifies that a public agency must approve or disapprove a permit application *on its merits* within the time limits set forth in the statute, and if the agency fails to do so, the application is "deemed approved." The Act expressly permits one, and only one, 90-day extension of the initial time limits by mutual consent. In this case, the deadline for final approval or disapproval, as once extended by mutual consent, was January 12, 1993, at the latest. However, the application was not formally denied until February 8, 1993. By the Act's express terms, the denial was therefore ineffectual, and the application must be "deemed approved." A majority of the Court of Appeal so concluded, and we should therefore affirm its judgment.

But a majority of this court refuse to do so. Instead, they hold that the applicant may unilaterally "waive" the statutory limit at will, and that a valid waiver occurred here. I cannot agree. At numerous points, and in consistent fashion, the Act makes clear that its time limits are strict and without exception, and that evasive tactics are prohibited. Nowhere does the Act contradict itself by providing that the applicant may nonetheless extend the limits indefinitely by means of unilateral "waivers." On the contrary, aware that such "waivers" would undermine the Act's stern purposes, its drafters included a number of safeguards against use of this very device to circumvent the rigid statutory limits.

The reason for doing so is illustrated by the facts of this case. They suggest that the agency sought to coerce both further time and further modification of the applicants' completed plans by implying that a delay for plan revisions, which delay would go beyond the final, already extended statutory time limit, was the applicants' only chance for final approval of their application in some form. At worst, the applicants' assent to the continuance at issue here was but a reluctant acknowledgement of their limited options, and at best, it was indistinguishable from a "mutual consent" extension of the kind already employed in this case to the maximum extent permitted by the Act. Even the dissenting justice in the Court of Appeal concluded that the applicants' conduct did not amount to a valid unilateral waiver. I therefore cannot join either the majority's reasoning or their result.

As the majority indicate, at the time pertinent here, section 65950 directed that the "lead agency" for approval of any "development project" must "approve or disapprove the project" within a specified time after the application for approval was "received and accepted by the agency as complete." The time for approval or disapproval was *one year* if the project required

---

[1]All further unlabeled statutory section references are to the Government Code.

preparation of an environmental impact report (EIR) under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), and *six months* if a "negative declaration" was adopted under CEQA to the effect that the project would have no significant effect on the environment. The latter limit is applicable here.[2]

Then, as now, section 65950 declared that the time limits described therein would apply "unless the project proponent requests an extension of the time limit." However, as today, the Act elsewhere provided that "[t]he time limits established by Section[] 65950 . . . may be extended *once* for a period *not to exceed* 90 days upon consent of the public agency and the applicant" (§ 65957, italics added), and that "[a]ll time limits specified in this article are *maximum* time limits for approving or disapproving development projects" (§ 65953, italics added). The conclusion is inescapable that any right of the applicant to request an extension of the time limit is subject to the *single* 90-day extension provided by the statutory scheme.[3]

---

[2]The Act has long made provision for the extra time necessary to consider more complex projects which involve significant environmental issues. At the time pertinent here, the Act required final approval or disapproval within six months after "complet[ion]" of the application in cases involving negative declarations under CEQA, but doubled the decision time to one year if an EIR was required. (Former § 65950, as amended by Stats. 1983, ch. 823, § 1, p. 2984.) Since 1983 the Act has also made clear that if an EIR is required, and the time to prepare and certify this document has been extended pursuant to CEQA, the deadline for final approval or disapproval will not run until 90 days after certification of the EIR. (§ 65950.1, as added by Stats. 1983, ch. 1240, § 1, p. 4861.) Furthermore, the current version of the Act measures *all* time limits for final approval or disapproval in terms of the environmental review process, rather than the date the application was "complete." The Act now provides that the project shall be approved or disapproved within 180 days after an EIR is certified, or 60 days after a negative declaration is adopted. (§ 65950, subd. (a)(1), (2), as amended by Stats. 1996, ch. 808, § 1.) CEQA, in turn, allows local agencies to take up to one year after the application is "complete" to prepare and certify an EIR, and up to one hundred eighty days after the application is "complete" to prepare and adopt a negative declaration. (Pub. Resources Code, § 21151.5, subd. (a)(1)(A), (B), as amended by Stats. 1996, ch. 808, § 3.)

[3]As originally adopted in 1977, section 65957 did not include the word "once" between "extended" and "for." (See Stats. 1977, ch. 1200, § 1, p. 3996.) As the Court of Appeal majority noted, this "emphatic and, we believe, significant word" was added by a 1978 "clean-up" bill (Stats. 1978, ch. 1113, § 8, p. 3402), indicating that its inclusion was purposeful. Indeed, as the Court of Appeal majority further observed, "[i]nterested parties wrote the Governor's Office with their views as to whether or not he should approve the 1978 'clean-up' bill; one such group was the League of California Cities. In September of 1978, that group's general legislative counsel wrote the Governor generally supporting the bill, but with one major reservation. His reservation clearly pertained to the newly reinforced section 65957: 'There are some elements of the bill with which we disagree—notably that part which precludes mutual agreement of an applicant and a local entity to extend permit processing times. This provision was advocated by the Governor's Office of Planning and Research as respecting the Governor's and the "private sector's" wishes. Their viewpoint does not coincide with the experience of local government on this point.' (Letter of Sept. 15, 1978

If the agency fails to approve or disapprove the project within this "maximum" time period, "the failure to act shall be deemed approval of the permit application for the development project." (§ 65956, subd. (b).) The legislative intent to make time "of the essence," and to impose "reasonable *but firm* [mandatory] time limitations on the deliberations of public agencies concerning land use decisions" (*Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 293 [223 Cal.Rptr. 542], italics added, fn. omitted) has been characterized as "unmistakably clear" (*id.* at p. 290).

The Act nowhere authorizes agencies to free themselves from these strict and mandatory limits by extracting time waivers from permit applicants. On the contrary, the Act has always included safeguards designed to prevent just such abuses. During the period plaintiffs' application was pending, as now, section 65940.5 prohibited agencies from including time waivers in their lists of the requirements for "complete" applications (subd. (a)), or from deeming any application "incomplete" for failure to include such a waiver (subd. (b).)[4]

In a further indication that the stringent statutory time limits are not to be circumvented by evasive devices, the Act now provides that "[no] public agency shall disapprove an application . . . in order to comply with the time limits specified in this chapter. Any disapproval [decision] shall specify reasons for disapproval other than the failure to timely act in accordance with the time limits specified in this chapter." (§ 65952.2, as added by Stats. 1993, ch. 1068, § 3.)

The majority disregard these overwhelming signals that the Act's time limits are not to be disturbed or evaded. On the contrary, they conclude that the statutory deadlines are meaningless if the agency can at some point

---

from general legislative counsel, League of Cal. Cities to Governor Edmund G. Brown, Jr., contained in Governor's chaptered bill file, ch. 1113 (1977-1978 Reg. Sess.).)"

In *1996*, after the events at issue here, section 65950 itself was amended to provide that "[n]othing in this *section* precludes a project applicant and a public agency from mutually agreeing to *an extension* of any time limit provided by this section." (§ 65950, subd. (b), as added by Stats. 1996, ch. 808, § 1, italics added.) By its terms, this amendment does not undermine any "extension cap" imposed by *other* sections of the Act, such as section 65957. A harmonious reading of sections 65950 and 65957 confirms that insofar as the applicant and the agency may "mutually agree[]" to "an extension" of time, such extension is limited to the single 90-day period set forth in the latter statute.

[4]In 1993, section 65940.5 was amended to provide additionally that except for certain time "waiver[s]" to which *the agency* is expressly entitled when the time for preparing an EIR has been validly extended (see §§ 65950.1, 65951), the agency may not require a waiver of time limits "as a condition of accepting or processing the application for a development project." (§ 65940.5, subd. (c), as added by Stats. 1993, ch. 1068, § 1.) Use of the words "waive" and "waiver" in these sections appears imprecise; the effect of sections 65950.1 and 65951 is simply to extend the agency's deadline in such cases to a new time certain.

persuade the applicant to "waive" them "unilaterally." The majority invoke the principle that one may intentionally relinquish or abandon a right personal to him, including the advantage of a law intended primarily for his benefit. (See Civ. Code, § 3513; *Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 314-315 [24 Cal.Rptr.2d 597, 862 P.2d 158]; *People* v. *Trejo* (1990) 217 Cal.App.3d 1026, 1032 [266 Cal.Rptr. 266].) For several reasons, that principle is inapposite here.

In the first place, an individual may not waive the provisions of a law "established for a public reason" (Civ. Code, § 3513) if the waiver would " ' "contravene any . . . public policy reasons motivating the enactment of the statute[]" ' " (*Cowan* v. *Superior Court* (1996) 14 Cal.4th 367, 372 [58 Cal.Rptr.2d 458, 926 P.2d 438]). That the instant Act arose from the debacle over Dow Chemical Company's decision to abandon plans for a major petrochemical plant because of permit delays (see, e.g., *Ciani* v. *San Diego Trust & Savings Bank* (1991) 233 Cal.App.3d 1604, 1609, fn. 1 [285 Cal.Rptr. 699]; Wilson, *Down Stream from Streamlining* (Aug. 1987) 7 Cal.Law. 67) does not imply that the sole, or even primary, purpose of the statute is to protect permit applicants themselves from the damaging consequences of bureaucratic delay. As the Court of Appeal majority observed, such delays have deleterious implications far beyond the concerns of the individual whose permit application is pending.

Thus, foot dragging *by either the agency or the applicant* on a permit application denies closure to neighbors and other vitally concerned persons, both "pro" and "con," who are entitled to a resolution at some point so they may cease their efforts in opposition or support and get on with their lives. Moreover, where applications for commercial development are concerned, extensive procrastination on individual applications also promotes a general perception that the local regulatory climate is difficult, thus discouraging other worthy and job-producing enterprises from seeking to locate in the region. Certainly this was a major concern of the Act's drafters in the wake of the Dow Chemical incident.

Delay of this kind also clogs the agency's docket, hindering the agency's efforts to turn in timely fashion to other applications and other business pending before it. And it denies the taxpayers generally the benefits of a diligent, efficient, and responsive government.

The strict time limits provided by the Act serve to ameliorate all of these significant concerns. Thus, allowing the permit applicant alone to waive the

time limits at will would severely undermine the important "public poli-c[ies]" promoted by the Act.[5]

In addition, the time limits provided by the Act were intended to protect the applicant himself against abuses beyond mere delay. In the Act, the Legislature declares "a statewide need to ensure *clear understanding of the specific requirements* which must be met in connection with the approval of development projects and to expedite decisions on such projects." (§ 65921, italics added.) As one Court of Appeal has observed, "There was a dual concern for (1) establishing guidelines for communication between . . . applicants and public agencies, *communication intended to remove games-manship* from the application process, and (2) establishing time limits which would allow full and fair consideration of applications for development . . . while protecting applicants from the *arbitrariness and caprice associated with unjustifiable delay.*" (*Palmer* v. *City of Ojai, supra,* 178 Cal.App.3d 280, 290, italics added.)

The majority's conclusion that the Act's limits can be "waived" exposes applicants to those very tactics of governmental delay and indecision which the Act sought to keep in check. Under such a system, the agency, holding all the cards, can dawdle over an application, raising at leisure ever-changing objections to the plans submitted, threatening to deny the application in its current form, but dangling the hope that the project might ultimately be approved in some form if only the applicant will permit additional time for decision and try, try again. Such a scenario involves exactly the kind of "gamesmanship," "arbitrariness," and "caprice" the Act seeks to eliminate, and it appears to be precisely what happened in this case.

Sometimes objections to a particular application can be solved or compro-mised to the satisfaction of all interested persons if the parties are allowed a degree of additional time. It may then be best to permit diligent, focused, and

---

[5]In this respect, our recent decision in *Cowan* v. *Superior Court, supra,* 14 Cal.4th 367, upon which the majority rely by analogy, is starkly distinguishable. In *Cowan,* we held that a criminal defendant, as part of a plea bargain on a charge of capital murder, which has no limitations period, may knowingly and voluntarily waive the statute of limitations on the lesser included offense of manslaughter, so as to allow his conviction on that lesser negotiated charge. We noted that a criminal limitations period is primarily for the defendant's benefit, though it also serves public policies which (1) encourage self-reformation over time without the need for society's intervention, (2) discourage further crime in the form of long-delayed blackmail, and (3) recognize that never-ending threats of criminal prosecution are deleterious to a civilized society. We simply concluded that none of these policies is undermined, or even implicated, by allowing the defendant to waive the limitations period for a *lesser* offense when he otherwise faces conviction for a *greater* offense *on which the statute of limitations has not run.* (*Cowan* v. *Superior Court, supra,* 14 Cal.4th at pp. 374-375.)

good faith negotiations to continue for a reasonable period rather than force the agency to deny the application prematurely and require the applicant to start the process over. The Act recognizes these realities by providing that the applicant and the agency may extend the time deadline for 90 days by mutual "consent." (§ 65957.) But the intent that such negotiations not drag on indefinitely is expressed in the Act's requirement that such an extension shall occur only "once." (*Ibid.*) This provision reflects a clear legislative judgment that further delays, even those to which the applicant "consent[s]," undermine all the interests the Act was intended to promote.[6]

The majority insist that a unilateral "waiver" of time by the applicant is analytically distinct from the single "mutual consent" extension allowed by the Act. Such is not the case. In the first place, the notion that a unilateral time "waiver" differs from a mutual time "exten[sion]" is pure fiction in this context. In the former case no less than in the latter, *both parties* concur in the additional time, the applicant by agreeing to "waive" the deadline, and the agency by voluntarily accepting and acting on the waiver. Moreover, both forms of time extension arise under exactly the same circumstances: The agency indicates that it is not prepared to approve the application within the unextended deadline, so to prevent an immediate denial, one or the other party raises the possibility of additional time to make the final decision.

The facts of the instant case are illustrative, and they do not remotely suggest a voluntary and unilateral "waiver," as opposed to an extension of time by mutual "consent." After a number of continuances to allow revisions in response to agency objections, plaintiffs' latest plans were considered at a planning commission (Commission) meeting held on November 9, 1992—a date already well within the 90-day "mutual consent" extension period. During the meeting, Commission members engaged in multiple criticisms of the newest version of plaintiffs' remodeling project. Then plaintiffs were told that the revised plans, like their predecessors, "[were] not going to pass tonight . . . [s]o it looks like we're on [another] continuance" "if that's what the applicant would like."

---

[6]Despite its concern that the requirements for permit approval be made clear, the Act appears to allow for substantial revisions of the project as the application proceeds, and to grant additional time for consideration of these changes without requiring formal denial and reapplication. Since 1984, the Act has provided that even after a "complete" application is on file, any "resubmittal" of the application begins anew the 30-day period for assessing its "complete[ness]," and thus also restarts the time for final approval or disapproval. (§ 65943, subd. (a), as amended by Stats. 1984, ch. 1723, § 1, p. 6251.) "Resubmittal," as used in this context, apparently includes the applicant's provision of new materials *as part of the pending application*, and is not limited to the filing of a new formal application after withdrawal of the old. (See *id.*, subds. (b), (c).) However, defendant in this case has not argued that the plan revisions furnished by plaintiffs in response to agency suggestions were "resubmittals" that restarted the time clock for final approval or disapproval.

Thus made aware that even further revisions were their last, dubious hope for some form of approval, plaintiffs had no option but to accede to the Commission's explicit offer of a further "continuance" in lieu of immediate denial. Without consulting further with plaintiffs, the Commission's chair then announced a three-month continuance, which was beyond the ninety-day extended statutory deadline. A "waiver" procured in that way is hardly "unilateral" to the applicant, and it appears sufficiently coerced by agency "gamesmanship" as to be involuntary.[7]

I therefore conclude that the Act's provisions and purposes preclude an individual applicant from "waiving" the strict and clear times limits for final approval or disapproval of a permit application, as set forth in the statute. Nor would such a holding open the door to future abuse by applicants, who might employ a tactic of agreeing to waivers, then later claiming their waivers were invalid. Agencies aware of the rule that waivers were not permitted would have ample means of protecting themselves against maneuvers of that kind.

Finally, I find no basis to accept defendant's alternative argument that plaintiffs are barred by principles of equitable estoppel from asserting the "deemed approved" sanction provided by the Act. The party to be estopped must have misrepresented or concealed material facts with knowledge of the truth, and with an intent to induce the other party's act or reliance. Conversely, the party asserting an estoppel must have been *permissibly ignorant* of the true facts, and must have been induced to act or rely on the other's statement or concealment. If even one of these elements is missing, an estoppel does not arise. (E.g., *Cal. Cigarette Concessions* v. *City of L. A.* (1960) 53 Cal.2d 865, 869-870 [3 Cal.Rptr. 675, 350 P.2d 715]; *Green* v. *Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 556 [230 Cal.Rptr. 13]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, pp. 858-860.)

Here, plaintiffs did not misrepresent the statutory time limits on approval or disapproval of their application, and in any event, the Commission cannot

---

[7]It might be argued that plaintiffs share the blame for the difficulties their application encountered. Advised early on that their original proposal for a full second story addition to their home seemed inappropriate, plaintiffs were apparently slow to depart from that concept. At the November 9, 1992, meeting, members of the Commission continued to urge that plaintiffs consider a "partial second story," which suggests that the plans as revised still depicted a full upper floor. But the Act has a sanction for such recalcitrance by an applicant; the application may be denied within the time limits. Thus, the Act encourages *both* the agency and the applicant to work quickly and in good faith toward any compromise that might be reached.

be deemed permissibly ignorant thereof. As a matter of law, therefore, no estoppel can apply.

I would affirm the judgment of the Court of Appeal.

Chin, J., and Brown, J., concurred.